**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**DAVID C. MARTIN,**

                    **Plaintiff,**

     **-against-**                                   **7:10-CV-1113(TJM)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                         **Defendant.**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**THOMAS J. McAVOY,**
**Senior United States District Judge**


### DECISION & ORDER

### I.    INTRODUCTION

     David C Martin ("Plaintiff") brought this suit under the
Social Security Act ("Act"), 42 U.S.C. § § 405(g), 1383(c)(3) to
review a final determination of the Commissioner of Social Security
("Commissioner")denying his application for disability insurance
benefits "DIB")and Supplemental Security Income ("SSI").  Plaintiff
alleges that the decision of the Administrative Law Judge ("ALJ")
denying his applications for benefits was not supported by
substantial evidence and was contrary to the applicable legal
standards.  The Commissioner argues that the decision was supported
by substantial evidence and made in accordance with the correct
legal standards. Pursuant to Northern District of New York General
Order No. 8, the Court proceeds as if both parties had accompanied

1

their briefs with a motion for judgment on the pleadings.

## II. BACKGROUND

### A. Procedural History

Plaintiff, David C. Martin (hereinafter "Plaintiff') was born on November 18, 1967.(Tr. 30). He contends that he suffers from an anxiety disorder manifested by dizziness, cervical radiculopathy, right shoulder pain and headaches. January 8, 2007 is Plaintiff's alleged onset date of disability.  Plaintiff was formerly employed doing building maintenance. He left school in the 11th grade, completing a GED sometime thereafter (Tr. 30).

Plaintiff filed an application for Social Security Disability benefits on June 4, 2007.(Tr. 108-119). He alleged a disability due to a pinched nerve in his neck, minimal use of his right arm, panic attacks, anxiety disorder, dizziness and light headedness (Tr. 134). Plaintiff's claim was initially denied on August 29, 2007. (Tr. 66-69). A request for reconsideration was filed on September 9, 2007 and a request for a hearing was filed on September 12, 2007. (Tr. 72-75). Thereafter a hearing was held before Administrative Law Judge Elizabeth W. Koennecke on September 3,2009 via video conference with the Plaintiff appearing in Watertown, New York and ALJ Koennecke appearing in Syracuse, New York. Plaintiff appeared with counsel and testified as to his disabilities and conditions. (Tr. 26-62). ALJ Koennecke issued a decision dated October 19, 2009 finding that Plaintiff is not disabled. (Tr. 4-

20). Plaintiff's counsel made a request for review of the Administrative Law Judge's decision on December 12, 2009. (Tr. 21-25). The Appeals Council affirmed the Administrative Law Judge's decision on September 9, 2010. (Tr. 1-3). This action followed.

**B. Medical Evidence**

The following facts are taken from Plaintiff's brief, to which Defendant consents.  <u>See</u> Def. Mem. of Law at 2.

Beginning January 8, 2007, Plaintiff reported serious problems with dizziness and neck spasms. He began treatment at the Mountain Medical Urgent Care Center in Watertown, New York on January 8, 2007, continuing treatment through January 31, 2007. (Tr. 231-245). Plaintiff's symptoms of severe dizziness and nausea were noted, as well as his complaint that these conditions were aggravated by standing. (Tr. 235). The Plaintiff was seen at the Samaritan Medical Center Emergency Department on February 6, 2007 for an allergic reaction to Lexapro. (Tr. 246-250). He was then seen in the emergency room at Carthage Area Hospital on March 13, 2007 for symptoms of nausea which were believed to be attributable to an antidepressant medication he was taking. He was seen again at the Carthage Area Hospital emergency department on April 3, 2007 for complaints of severe pains in the neck radiating up to the base of his skull and dizziness. X-rays revealed degenerative arthritis at C5-C6. It was recommended that an MRI be ordered. (Tr. 257-258).

Plaintiff also underwent an esophagogastroduadenoscopy in an

effort to diagnose his nausea. The test results were normal. (Tr. 259-260). Plaintiff reported again to the Carthage Area Hospital emergency department on April 15, 2007 complaining of having headaches and dizziness for three months as well as facial numbness. (Tr. 265-273). A CT scan was taken of his brain which was read as otherwise unremarkable. (Tr. 273). His discharge diagnosis was poorly controlled hypertension with dizziness - chronic, with possible vertigo and rule out intracranial bleed and intracranial mass, possible anxiety with non-compliance. (Tr. 267-268).

Plaintiff reported again to the Carthage Area Hospital emergency department on May 28, 2007 with complaints of backache. An x-ray of his lumbosacral spine revealed no evidence of pathology, fractures, subluxation or dislocation. (Tr. 290-291). Plaintiff was diagnosed with a backache due to possible disarrangement or ligamentous sprain. (Tr. 290-291). X-rays and an MRI were taken of his thoracic and lumbo-sacral spine on May 28,2007 and May 31, 2007. Minimal decreased disc signal was observed at T8-9 and minimal disc bulge observed at L3-4 and L4-5. (Tr. 294-296).

Plaintiff began treating with Dr. Mirza Ashraf on April 16, 2007. Dr. Ashraf noted Plaintiff's complaints of dizziness was "so bad I can't do anything", as well as neck and right shoulder pain. (Tr. 319). Dr. Ashraf ordered an MRI of Plaintiff's cervical spine which revealed:

4

"degenerative disc disease mostly at C5-6 with superimposed mild midline disc herniation, causing moderate crowding of the thecal sac ... moderate right and mild left neural foraminal narrowing in C5-6 ... small or mild narrowing left C3-4 neural foramen ... thecal sac is relatively small in C3-4 and C4-5 [and] there is straightening of the cervical lordosis." (Tr. 288-289).

Dr. Ashraf completed an assessment of Plaintiff's ability to function in June 2007 noting Plaintiff was limited in his ability to lift and carry 10 pounds; can stand and/or walk less than two hours per day; is limited to sitting up to six hours per day; and is limited in his ability to push and/or pull. (Tr. 274-280).

Plaintiff began treating at the Philadelphia Clinic on March 29, 2007 with Dr. Kahn, who ordered the MRIs of Plaintiff's thoracic and lumbar spine referenced above. Dr. Kahn also referred Plaintiff to Dr. Latif, a neurologist in Watertown, and the University Hospital-Orthopedic Surgery Unit in Syracuse. Plaintiff was seen at the Philadelphia Clinic eight (8)times between February 6, 2007 and May 29, 2007 for anxiety, vertigo, abdominal pain, heartburn, and dizziness, in addition to back pain. Plaintiff was prescribed Paxil and Lexapro for his anxiety/panic disorder. (Tr. 325-342). Plaintiff declined to take Lexapro due to a bad reaction following an incident in February. (Tr. 332). The Philadelphia Clinic also prescribed Meclizine to the Plaintiff for dizziness. (Tr. 331).

Plaintiff was examined and treated by Dr. Kevin Scott, an orthopedist with North Country Orthopedic Group from May 2, 2007 -

July 9, 2008. (Tr. 483-503). Dr. Scott noted, upon reviewing Plaintiff's MRI of his cervical spine during the examination on May 2, 2007, an osteophytic complex at C5-6, and small midline disc herniation, as well as moderate right and left neuroforaminal narrowing. (Tr. 483). Dr. Scott concluded that Plaintiff was suffering from cervical spine disease with right upper extremity radiculopathy. (Tr. 483). A nerve conduction test was ordered and conducted on May 17,2007, which revealed "electrophysiologic evidence in this study of chronic right C5-6 radiculpathy". (Tr. 485,498-499). The test results also revealed an old left median neuropathy distal in Plaintiff's midpalm. Dr. Scott referred Plaintiff to a neurologist, Dr. Latif, regarding his symptoms of dizziness, and to the Pain Clinic for nerve injections in his cervical spine area. (Tr. 486). Dr. Scott also referred Plaintiff to the Ear, Nose and Throat Clinic in Syracuse for examination and treatment of his long history of vertigo and right ear fullness and pain. (Tr. 487). During his examination on December 12, 2007, Dr. Scott reviewed an MRI of Plaintiff's right shoulder which revealed degenerative changes and a small partial-thickness tear of the distal supraspinatus tendon and degenerative fraying of the anterior labrum. (Tr. 490). Dr. Scott noted these observations in the context of Plaintiff's complaints of pain in his neck radiating down into his right arm and right deltoid region. (Tr. 490). Plaintiff was prescribed physical therapy and treatment through the

6

Pain Clinic. (Tr. 490).

Neurologist Dr. Abdul Latif examined Plaintiff on July 2, 2007 following a referral from Dr. Scott to evaluate his complaints of dizziness. Dr. Latif's examination was inconclusive; he ordered additional tests and prescribed Depakote for treatment of his headaches. (Tr. 224-225).

Plaintiff was examined on July 9, 2007 by Dr. Ivan Montalvo-Otano for pain management in his cervical spine. Dr. Montalvo-Otano noted some reduction of sensation in Plaintiff's legs, and he noted the findings of disc herniation and radiculopathy in Plaintiff's MRIs and EMG. (Tr. 344). No pain management treatment was elected at this time. Plaintiff saw Dr. Montalvo again on November 19, 2007 and December 6, 2007. Treatment options were discussed, and it was decided that cervical epidurals would be given if the orthopedic intervention failed and it was determined that the pain was coming from his spine. (Tr. 424-429).

Plaintiff was also seen at the Emergency Department of University Hospital on June 21, 2007 and July 20, 2007 for his symptoms of dizziness with nausea and tinnitus. He was referred to the ENT clinic at University Hospital where he was seen on August 3, 2007. The exam was conducted by Dr. Charles Woods who found no inner ear problem and concluded that Plaintiff does not have true vertigo or room-spinning vertigo. (Tr. 354-355). No specific recommendations could be made at that time.

7

Plaintiff was also seen by Dr. Huang at the North Country Orthopedic Group on June 23, 2008 concerning the pain in his neck and right upper trapezius region. Dr. Huang noted Plaintiff was experiencing pain in certain range of motion tests of his neck, shoulder and upper back. He diagnosed Plaintiff with cervical spondylosis, with degenerative and herniated disc, pain and radiculpathy. (Tr. 492-493). Dr. Huang discussed with the Plaintiff the possibility that his vertigo was attributable to his spinal problems. (Tr. 540). In his examination of July 9, 2008, a lipoma was found on his upper back. (Tr. 495). Plaintiff was referred to North Country Surgical Specialists for removal of the lipoma. (Tr. 497). Plaintiff's condition continued to be followed by the North Country Orthopedic Group through 2008 and 2009. They put continued treatment on hold, pending a diagnosis of his dizziness. (Tr. 524). An additional MRI of his cervical spine was taken on January 22, 2009 which revealed C5-C6 broad-based disc bulge with subligamentous disc herniation with some spinal stenosis and mild bilateral foraminal encroachment; C4-5 and C3-4 disc disease including a central small sub ligamentous disc herniation and mild central canal stenosis, but no foraminal encroachment. (Tr. 528-529). Plaintiff underwent a needle electromyogram (EMG) on February 24, 2009 which was noted as a mildly abnormal study, raising the possibility of mild, chronic right C5-6 radiculpathy and mild, chronic, left C7 radiculpathy. (Tr. 53 1-535). Treatment plans were

8

discussed with the Plaintiff, including a surgical option;
Plaintiff elected a more conservative route including physical
therapy and electrical stimulation. (Tr. 537). Plaintiff was also
prescribed a cervical traction device. (Tr. 541).

Plaintiff was examined and treated at Mercy Center for
Behavioral Health and Wellness from April 26, 2008 through July 29,
2009. He was first seen by Dr. Kimball on April 21, 2008 where he
was given a psychological assessment, and then a psychiatric
assessment by Dr. Camillo on April 26, 2008. (Tr. 512-520). Therein
Dr. Kimball noted Plaintiff's symptoms of dizziness, shaking,
feeling off-balance, heavy panic attacks, "fear feeling", anxiety,
and fear of going to public places. He diagnosed Plaintiff with
panic disorder with agoraphobia, social phobia, generalized anxiety
and depressive disorder. (Tr. 519). He gave Plaintiff a Global
Assessment of Functioning ("GAF")[1] score of 35, concluding:

> "The anxiety symptoms are quite severe. He has extreme
> avoidance behaviors. He is getting a thorough physical exam on
> April 30, 2008. It is important to totally rule out any
> medical cause. However, most likely anxiety is causing his
> difficulties. He is being referred to our staff psychiatrist
> to confirm this diagnosis and to determine if other
> medications may be helpful. He also needs anxiety management
> treatment. He needs intensive counseling for anxiety
> management." (Tr. 520).

Plaintiff was then seen by Dr. Camillo on April 26, 2008 who
assessed him with a severe anxiety disorder, with a GAF score of

---

[1]The GAF scale ranks psychological, social, and occupational functioning
on a hypothetical continuum of mental health-illness. *See* American Psychiatric
Association, *Diagnostice and Statistical Manual of Mental Disorders* 32 (4th ed.
2000) ("DSM-IV"); *Pollard v. Halter*, 377 F.3d 183, 186 n.1 (2d Cir. 2004).

37. (Tr. 515). Claimant was prescribed Klonopin and Buspar, and received regular psychotherapy. (Tr. 521). An annual assessment prepared by Nurse Joyce Comes on April 2, 2009 confirmed that Plaintiff was to continue psychotherapy and receive medications. (Tr. 510-511). She gave him a GAF score of 55 on that date. Nurse Comes noted that Plaintiff had benefitted from cognitive behavioral therapy such that it enabled him to go deer hunting in the Fall of 2008, although she noted that he continued to suffer from dizziness which is affected by his prior physical activities from the day before. (Tr. 510). Dr. Camillo on two occasions submitted psychiatric reports for employment activities to the Jefferson County Department of Social Services wherein he identified the following necessary work accommodations for Mr. Martin:

> 1. "would need to be able to call off work without notice - becomes dizzy without warning";
> 2. "only able to do activity for short period (approximately half hour)." (Tr. 572 and 574).

Plaintiff received physical therapy from March 12, 2009 through June 11, 2009 from Samaritan Medical Center in Watertown. (Tr. 541-570). Along with physical therapy he also received a cervical traction device which he is to use daily. (Tr. 541). The physical rehabilitation records suggest that he reported some improvements with his neck and a reduction in dizziness. (Tr. 541-570). A prior attempt at physical therapy from December 19, 2007

10

through March 24, 2008 through Carthage Area Hospital had similar results. (Tr. 457-482).

Plaintiff underwent a consultative psychiatric examination on August 7, 2007 conducted by Dr. Jeanne Shapiro. (Tr. 356-360). Dr. Shapiro noted that vocationally she believed Plaintiff appeared to be capable of understanding and following simple directions and capable of performing simple and complex tasks with supervision. She saw some anxiety, but otherwise found no basis for a mental health diagnosis, concluding that his dizziness was attributable to a physical, not a psychiatric condition. (Tr. 357).

Plaintiff also underwent a neurologic consultative examination on August 7, 2007 conducted by Dr. Kalyani Ganesh. (Tr. 361-364). Dr. Ganesh noted Plaintiff's complaints of pain and dizziness, and observed some tremulousness and shaking of the legs intermittently, which interfered with Plaintiff's attempts to walk on heels and toes as instructed. (Tr. 362 and 364). Dr. Ganesh concluded that Claimant would have no difficulty sitting, standing, or walking, with only mild to moderate limitations lifting, carrying, pushing and/or pulling. (Tr. 364).

A Residual Functional Capacity Assessment was prepared by J. Ayres on August 14, 2007. (Tr. 365-370). There is no indication in the physical residual functional capacity assessment that J. Ayres is a physician or otherwise qualified to prepare this assessment. (Tr. 370). The assessment found that the Plaintiff had the ability

11

to occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk at least two hours in an eight hour work day, sit about six hours in an eight hour work day, and had an unlimited ability to push and/or pull. (Tr. 366). Ayres also found that Plaintiff had certain postural limitations, such that he should never climb ramps, stairs, ladders, lifts or scaffolds, and should not engage in any activities requiring balancing. (Tr. 367). Ayres also found that Plaintiff could only occasionally engage in activities involving stooping, kneeling, crouching and crawling, and must avoid hazards. (Tr. 367 & 368). All such postural limitations were attributable to Plaintiff's dizziness.

Defendant adds the following facts to those provided by Plaintiff.

When Plaintiff was examined by Dr. Shapiro, the psychiatric consultative examiner, on August, 7, 2007, Plaintiff complained of "chronic pain and dizziness" that began in January 2007, and he stated that he woke up three or four times a night (Tr. 356). His appetite was normal, and he did not have any significant manic or depressive symptoms, or symptoms of a formal thought disorder or cognitive dysfunction (Tr. 356-57). According to Plaintiff, his medication (Meclazine and Alprazolam) had improved his symptoms, but "some symptoms" still occurred (Tr. 357). Plaintiff reported having "panic attacks" that were characterized by feelings of dizziness, shakiness, and a lump in his throat. *Id.* He felt panic

12

due to a feeling "like a shot of electricity" running from his stomach up to his throat. *Id.*  All of his medical tests to that point had been negative. *See id.* On examination, Plaintiff's demeanor and responsiveness were cooperative, and his manner of relating, social skills, and overall presentation was adequate (Tr. 358). His gait and posture were normal; he used no assistive devices and did not support himself by touching the wall or anything else as he walked. *See id.* His thought processes were coherent and goal directed, with no evidence of delusions, hallucinations, or disordered thinking. *See id.*  Dr. Shapiro noted that Plaintiff was "a little anxious" and "a little apprehensive"; Plaintiff said that he was "'probably nervous' because he did not know what to expect" during the examination. *Id.*  Plaintiff's sensorium was clear and he was oriented times three. *See id.* His attention and concentration skills were intact, and his intellectual functioning appeared to be in the low average range. *See id.* His insight and judgment were fair. *See id.* Plaintiff reported being able to dress, bathe, and groom himself, but due to his dizziness could only fix a sandwich or a bowl of cereal (instead of cooking), and could not clean, do laundry, or go shopping (Tr. 358-59). He was able to take public transportation, however, and drove infrequently (Tr. 359).  He also reported "gett[ing] along well with friends and family." *Id.* According to Dr. Shapiro, Plaintiff was capable of understanding and following

13

simple instructions and directions, and could perform simple and complex tasks both independently and under supervision (Tr. 359). He appeared to be able to maintain concentration and attention for tasks, and could regularly attend to a routine and maintain a consistent schedule if he had reliable transportation. *See id.* He could make some appropriate decisions, deal with some stress, and was capable of relating to and interacting appropriately with others. *See id.* Dr. Shapiro also noted that the results of the examination were "inconsistent with [Plaintiff's] allegations." *Id.* Further, Plaintiff's "[r]eported psychiatric symptoms do not meet the criteria for diagnosis of a panic disorder and do not warrant a formal diagnosis." *Id.*

Dr. Kalyani Ganesh performed a consultative neurologic examination the same day (Tr. 361-64). Plaintiff reported being unable to do chores at home because of a "balance problem, dizziness, and shaking." (Tr. 361). On examination, Dr. Ganesh noted that Plaintiff's gait "appeared quite normal" and that he was able to walk "from the examining room to the front desk with no problem noted," and he used no assistive devices (Tr. 362). When asked to walk on his heels and toes, Plaintiff first was unable to because of "some tremulousness" in his legs. *Id.* He also could not tandem walk heel-to-toe at first because he was "anxious," but he eventually became more calm and was able to do so (Tr. 362-63). Plaintiff needed no help changing his clothes for the examination

14

or getting on and off the examination table, and he could rise from his chair without difficulty (Tr. 363). On examination, Plaintiff had a slightly limited range of motion in the cervical spine, and normal ranges of motion in the thoracic and lumbar spines. *See id.* A straight-leg-raising test was negative. *See id.* Examinations of Plaintiff's upper and lower extremities were normal, as was a sensory exam. *See id.* Dr. Ganesh diagnosed a history of dizziness and balance problems; neck pain; degenerative disc disease of the cervical spine; anxiety and panic; and lower-back pain. *See id.* In Dr. Ganesh's opinion, Plaintiff had no difficulties sitting, standing, or walking; and had a "mild to moderate" limitation with lifting, carrying, pushing, and pulling (Tr. 364). Dr. Ganesh also noted that Plaintiff had had some intermittent shaking in his legs at the beginning of the exam, but that it "seemed to ease up somewhat after he was relaxed." *Id.*

Plaintiff attended physical therapy from December 19, 2007 until March 24, 2008, when his physical therapist determined that he would no longer benefit from therapy services (Tr. 457). Plaintiff's pain had decreased significantly and he had "less dizziness overall," although he continued to experience dizziness "when he lifts [his right] arm overhead." *Id.* He reported being able to go shopping without "having to stop [and] leave due to dizziness and loss of balance," and he could complete his activities of daily living with some small amount of pain. *Id.* The

15

therapist, Ms. Holmerpt, suggested that Plaintiff's dizziness might be caused by muscle spasms in his shoulder or neck due to pain; a "hypersensitive" sympathetic nervous system might be causing "an exaggerated response to pain creating muscle spasms and dizziness." *Id.* She recommended further neurological testing. *See id.*

On April 3, 2008, Plaintiff went to Dr. Michael McElheran, an orthopedist, and reported "some improvement" in his dizziness (Tr. 491). On examination, Plaintiff walked with a normal gait and could walk on his heels and toes. *See id.* A straight-leg-raising test was normal. *See id.*

Dr. William Kimball, a psychologist, completed a psychological assessment of Plaintiff on April 21, 2008 (Tr. 516-20). Plaintiff reported dizziness, shaking, loss of balance, and being light-headed (Tr. 516). Plaintiff also stated that he did not feel light-headed if he ate small portions of food five times a day. *See id.* He spent most of his days in bed, and that he would become dizzy if he got out of bed. *See id.* According to Plaintiff, he no longer had panic attacks, although he did still have a "fear feeling" or "physical sensations in his chest." *Id.* In the past few years he had become less comfortable being around people, and had difficulty going to stores if other people were there (Tr. 516-17). On examination, Plaintiff's appearance, speech, and expressive language were normal (Tr. 517). He made good eye contact and was fully oriented and attentive (Tr. 517-18). His intelligence

16

appeared average, and his recent and remote memory were intact (Tr. 518). Plaintiff reported sleeping five hours a night and having a full appetite. *See id.* His judgement was fair and his insight was poor; he had no suicidal, homicidal, or other violent ideations (Tr. 519). Dr. Kimball diagnosed depressive disorder not otherwise specified, and assessed a GAF score of 35 (Tr. 519-20). In his opinion, Plaintiff's anxiety symptoms were "quite severe" and he showed "extreme avoidance behavior" (Tr. 520). Dr. Kimball recommended anxiety management treatment, "intensive counseling," and possible medication. *See id.* Plaintiff returned to Dr. McElheran on June 23, 2008 (Tr. 494). Dr. McElheran noted that Plaintiff continued to make "day-by-day improvements." *Id.* Plaintiff reported that his dizziness was "positional," and caused by lying on his back or by leaning forward. *Id.* He had not had any falls, and he walked with a normal gait. *See id.* Dr. McElheran noted that Plaintiff could move easily from a sitting to a standing position and could get on the examination table without any difficulty. Plaintiff was also able to walk on his heels and toes. *See id.* Dr. McElheran examined Plaintiff again on July 9, 2008 (Tr. 495-96, *repeated at* 522- 23). Plaintiff's "chief complaint" was dizziness, which was caused by leaning forward (Tr. 495). Dr. McElheran noted that Plaintiff had had "no change in his activities," was "doing physical therapy on his own," had no weakness in his upper extremities, and had no problems buttoning

17

clothes or getting dressed. *Id.* Dr. McElheran further noted that
Plaintiff walked with a normal gait, was able to walk on his heels
and on his toes, moved easily from a sitting to a standing
position, and could get onto the examination table without
difficulty. *See id.* Dr. McElheran advised Plaintiff to discontinue
physical therapy and continue performing his home exercises (Tr.
496). Plaintiff returned to Dr. McElheran on September 10, 2008;
January 16, 2009; and February 2, 2009 (Tr. March 18, 2011523, 527,
530). At each of these visits, Dr. McElheran noted that Plaintiff
walked with a normal gait and could walk on his heels and toes
without difficulty. *See id.* Plaintiff also reported no difficulty
with walking, and that he had not been falling (Tr. 530).

On October 3, 2008, Dr. Michael Camillo, a psychiatrist who
with his staff had treated Plaintiff since April 2008 (*see* Tr. 512-
21), completed a one-page psychiatric report, in which he indicated
that Plaintiff was capable of independently completing his
activities of daily living ; scheduling appointments; accessing
transportation; and attending appointments (Tr. 572). Although he
could "only do a little at a time," Plaintiff was able to wash
dishes, do laundry, and fix meals. *Id.* According to Dr. Camillo,
Plaintiff became dizzy without warning and was only able to do
activities for short periods of time, and "would need to be able to
call off work without notice." *Id.* Dr. Camillo diagnosed an
anxiety disorder, not otherwise specified. *See id.*

18

Plaintiff began physical therapy again on March 12, 2009, with the goal of reducing dizziness (Tr. 544-45).  On March 31, he underwent thirty minutes of therapy (10 minutes each of heat, manual, and therapeutic procedures) and he reported decreased pain and dizziness symptoms afterwards (Tr. 549).  At his next session on April 3, he reported that his pain and dizziness were "not . . . nearly as bad as last time." (Tr. 550). After thirty minutes of therapy, his dizziness symptoms were again decreased. *See id.* Plaintiff reported increased pain, however, at his next session on April 6 (Tr. 551).  Four days later, however, he was feeling "pretty good," and had decreased pain after another thirty-minute therapy session (Tr. 552). At the end of a session on April 13, Plaintiff reported that his pain was gone (Tr. 553). Two days later, his pain had returned after he had lifted a five-gallon jug of water; at the end of the therapy session his pain had been somewhat relieved (Tr. 554). In this session, Plaintiff did not mention dizziness. *See id.*

On April 20, Plaintiff reported experiencing neck pain after performing isometric neck exercises at home; his therapist advised not performing any exercises other than cervical retraction (Tr. 555). On April 24, Plaintiff reported having been dizzy "all week" to his physical therapist, but that he "fe[lt] good today" (Tr. 556).  Five days later, Plaintiff stated that "this is the best week I have had in terms of my dizziness" (Tr. 557).  His pain

level also continued to be very low. *See id.* Plaintiff was then discharged from physical therapy; the therapist noted that Plaintiff's prescription had expired but also that he had met his goals: "dizziness was described as 1-2/10 at last session" (Tr. 558).

On April 2, 2009, Joyce Combs, a registered nurse, completed a psychological assessment of Plaintiff (Tr. 510-11). Plaintiff continued to experience anxiety and dizziness, but had been able to go deer hunting "several times" in the fall of 2008 "by using cognitive behavioral therapy" (Tr. 510). The dizziness "comes and goes" and appeared to be partially related to what kind of physical activity he had done the day before. *Id.* Ms. Combs assessed Plaintiff's GAF as 55 (Tr. 511). Plaintiff received another prescription for physical therapy in May 2009, and resumed therapy on May 7 (Tr. 559). He reported that his previous therapy had decreased his pain and dizziness, but that his pain increased with increased activity (Tr. 562). He did not report an increase in dizziness. *See id.* At his May 21 therapy session, Plaintiff reported no dizziness, but reported some dizziness on May 26 after putting a day bed together for his mother (Tr. 563-64). After the May 26 therapy session, his dizziness was decreased (Tr. 564). He then did not report dizziness at his May 28 session for neck pain (Tr. 565). On June 2, he stated that he had "been great the last few days, but I'm a little dizzy today" (Tr. 566). The therapy

20

again diminished his symptoms. *See id.* On June 4, he reported "feeling pretty good" other than some soreness in his back (Tr. 568). Nor did he report dizziness at his June 9 session (Tr. 569). On June 11, he reported "just a little dizziness" and otherwise felt "pretty good"; the therapy session again diminished his symptoms (Tr. 570).

On July 27, 2009, Dr. Camillo and Ms. Combs completed a second one-page psychiatric report (Tr. 574). They indicated again that Plaintiff could independently perform his activities of daily living, schedule and attend appointments, and take transportation. *See id.* Plaintiff enjoyed being outdoors, and was now doing chores around the house, cooking, and other activities of daily living. *See id.* Dr. Camillo's assessment that Plaintiff became dizzy without warning, could do activities for only short times, and would need to cancel work without notice was unchanged, however, and Plaintiff also had difficulty "being around people." *Id.*

## C. **Plaintiff's Testimony**

Plaintiff was the sole person testifying at the hearing. (Tr. 26-62). He testified he lives alone, however, he was living with his wife, step-daughter and step-grandchild from the on-set date until July 2009. (Tr. 30-31). He alleged that his disability began on January 8, 2007, from which date he has continued to suffer from dizziness and nausea.(Tr. 32). He first sought treatment at Mountain Medical Clinic and then later Samaritan Medical Center

emergency room. (Tr. 32-33). Plaintiff also initially sought treatment at the emergency room of Carthage Area Hospital as he did not have insurance or a regular family physician. (Tr. 33). He also began to suffer pain in his neck and back which some doctors suspected may be causing the dizziness. (Tr. 35). Plaintiff also testified that his symptoms of anxiety had become quite severe in 2007. (Tr. 36-37). He affirmed that he does a lot of shaking, although no doctor has explained a reason for this condition. (Tr. 36). He was unable to drive a car in all of 2008 due to dizziness, and he was otherwise limited to lying in bed. (Tr. 37). He explained that although certain income was reported in 2007, this was attributed to him running a simple business with his wife and step-daughter mowing lawns. (Tr. 37-38). Plaintiff affirmed that his involvement in the business was limited to running an ad in the paper and accompanying his wife to the location for lawn mowing where he would advise her what to charge. (Tr. 38). Their income from this activity was approximately $50 every two weeks. (Tr. 38-39). Plaintiff affirmed that he was having a problem with headaches starting with January of 2007, and that he had pain in his right shoulder due to a torn tendon. (Tr. 40-41). He has pain every day from his neck and shoulder, but finds that the dizziness is most disabling. (Tr. 43-44). The pain was described as a constant pain at a level between 3 and 5 on a 10 point scale.  His pain rises to a level 10 approximately 15 out of 30 days in a month, triggered by

22

activity. (Tr. 44). He stated that he is dizzy every day and that he cannot stand for more than 10 minutes without otherwise feeling like he is going to pass out. (Tr. 44). Plaintiff asserted that his activities of daily living are greatly limited. His meals are limited to things that are simple to prepare, such as cereal and T.V. dinners; he receives some prepared food from his mother and sister. (Tr. 46). His mother and sister also help clean his house. He mows his lawn with a riding lawn mower which he does for about 15-20 minutes a day, which takes him 3 days to mow his whole lawn. (Tr. 47-48). Plaintiff attested that he believes the limitations listed by Dr. Camillo in the psychiatric report for employment activities (Tr. 572-573) are correct. (Tr. 53-54). He also explained his attempt at deer hunting as was referenced in his medical records. He said that in the Fall of 2008 he went out with his brother a few times for an hour to an hour and a half and would communicate with him via radio. (Tr. 54). He affirmed that he could not lift anything; his brothers would have to do everything if a deer were shot, and that he would not be able to help. (Tr. 54-55). He could not have done this in the year 2007.(Tr. 54).  Plaintiff explained that he needs to use ice, heat and biofreeze on a daily basis in order to manage the pain in his neck and shoulder. (Tr. 55-56). He uses a traction unit daily for 10 minutes at a time (Tr. 57); he sees a mental health counselor once a week for anxiety, and a psychiatrist once every three months. (Tr. 49). He has had

problems with anxiety all of his life, but it became much worse in the last few years. He does not like being around people (Tr. 49-50). Plaintiff also described his past employment, primarily building maintenance. (Tr. 60). His work involved repairing leaks and replacing refrigerators, working on stoves, laying tile, painting, lawn care and some construction. (Tr. 60).

## III. DISCUSSION

### A. Standard of Review

The Court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Shane v. Chater*, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. *See Tejada*, 167 F.3d at 773; *Balsamo*, 142 F.3d at 79; *Cruz*, 912 F.2d at 11; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also, Perez*, 77 F.3d at 46; *Townley v. Heckler*, 748

24

F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted). In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1 982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). However, although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**B. Analysis**

### 1. The Commissioner's Decision

To receive federal disability benefits, an applicant must be

25

"disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. § 423(a),(d).  A claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. § 423(d)(1)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).  Agency rules promulgated under the Act outline a five-step analysis to determine disability.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

> (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work; (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Carter, 221 F.3d 126, 132 (2d Cir. 2000).

At step one of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 8, 2007, his alleged onset date (Tr. 9). *See* 20 C.F.R. §§ 404.1520(b). 416.920(b).  At step two, the ALJ found that Plaintiff had two severe impairments: an anxiety order "manifested by dizziness," and cervical radiculopathy (Tr. 9-14). *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  At step three, the ALJ determined that Plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the impairments in the Listings (Tr. 14-15). *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). The ALJ therefore proceeded to determine Plaintiff's RFC, or what he could do despite the limitations caused by his impairments (Tr. 15-18). The ALJ found that Plaintiff was able to perform light work:[2] that is, he could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, had no limitation in his ability to stand, walk, or sit; and had some postural limitations. *See* Tr. 15; 20 C.F.R. §§ 404.1520(e), 416.920(e). At step four, the ALJ determined that, given Plaintiff's RFC, Plaintiff could perform "many parts" of his past relevant work as a maintenance worker (Tr. 18). *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at step five, the ALJ found

---

[2]*Light work* involves lifting and/or carrying up to 20 pounds occasionally and up to 10 pounds frequently. *See* 20 C.F.R. §§ 404.1567(a), 416.967(b). A job in the *light work* category requires either "a good deal of walking and standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* In his brief, Plaintiff does not challenge the ALJ's finding that he was physically able to meet these exertional demands.

that, in the alternative, Plaintiff was also capable of performing other jobs that existed in substantial numbers in the national economy. *See* 20 C.F.R. § 404.1520(f).

### 2. Plaintiff's Arguments

Plaintiff seeks reversal of the Commissioner's decision that he was not disabled because his anxiety disorder and cervical radiculopathy did not prevent him from performing jobs that existed in significant numbers in the national economy. Plaintiff does not challenge the Commissioner's finding that he was exertionally capable of performing light work. Instead, he argues that his anxiety disorder caused dizziness to a degree that made him incapable of working.  Thus, the Court must determine whether the ALJ's RFC finding was legally correct and supported by substantial evidence, and whether the ALJ properly determined at step five of the sequential analysis that Plaintiff was capable of performing jobs existing in substantial numbers in the national economy.

### A.   Treating Physician Rule

Plaintiff first argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Camillo, who prepared a psychiatric assessment of Plaintiff on October 3, 2008. *See* Pl. Br. at 12-15; Tr. 572. Under the "treating physician's rule,"[3] the

---

[3]"The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." *de Roman v. Barnhart*, No.03-Civ.0075, 2003 WL

ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. In this regard, the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); *see also de Roman*, 2003 WL 21511160, at *9; *Shaw*, 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998).

Dr. Camillo opined that Plaintiff "would need to be able to call off work without notice" because he experienced dizziness "without warning," and that he was only able to perform activities

---

21511160, at *9 (S.D.N.Y. July 2, 2003).

for a short period of time, approximately half an hour (Tr. 572). In her decision, the ALJ gave "limited weight" to Dr. Camillo's opinion, due, *inter alia,* to the fact that it was not supported by treatment records or by evidence of Plaintiff's own activities, and because it was contradicted by the opinion of the consultative psychiatric examiner, Dr. Shapiro (Tr. 17). Plaintiff argues that the ALJ erred by using Dr. Shapiro's report as a basis to give little weight to Dr. Camillo's assessment. *See* Pl. Br. at 14-15.

It is well settled that the opinion of a consultative examiner can override that of a treating physician. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Snell v. Apfel*, 177 F.3d 128, 132-33 (2d Cir. 1999); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). Dr. Shapiro's opinion as a consultative examiner is not infirm simply because she examined Plaintiff before he began treatment with Dr. Camillo. A consultative examiner is an independent physician who examines a claimant on a one-time basis. *See* 20 C.F.R. §§ 404.1517, 404.1519 *et seq.*, 404.1527(d), 416.917, 416.919 *et seq.*, 416.927(d). As a consultative examiner, Dr. Shapiro's task was to examine Plaintiff directly and provide a medical opinion based on that examination, rather than on a review of his medical records.

Moreover, there is substantial evidence supporting the ALJ's conclusion to give Dr. Camillo's opinion less than controlling weight. Dr. Camillo's assessment of Plaintiff's limitations was

contradicted by Plaintiff's treatment records, the observations of other medical personnel, and Plaintiff's own testimony. Plaintiff's medical records also show that his dizziness steadily improved after Dr. Shapiro examined him. *See* Tr. 457 (physical therapy from December 2007 to March 2008 resulted in "less dizziness overall"), 554-558 (physical therapy records from March 2009 to April 2009), 559-70 (physical therapy records from May 2009 to June 2009). In this regard, physical therapy steadily reduced Plaintiff's dizziness until it was rated at only "1" or "2" on a scale of ten by April 2009 (Tr. 558), and by June 2009 Plaintiff  reported "being great" for days at a time and then feeling only "a little dizzy" (Tr. 566). At one session Plaintiff did not report dizziness at all (Tr. 569) and soon after again felt "pretty good" with "just a little dizziness" (Tr. 570).

Further, other physicians noted in their records that Plaintiff did not seem to have any problems with balance or dizziness.  Both Dr. Ganesh, the consultative neurologic examiner, and Dr. McElheran, a treating physician, noted when examining Plaintiff that he walked normally with no indication of balance problems caused by dizziness. *See* Tr. 362 (despite complaints of a "balance problem," Plaintiff's gait was "quite normal" and he was able to walk "with no problem noted"); 491, 494, 495 523, 527, 530 (Dr. McElheran noting on multiple occasions that Plaintiff walked with a normal gait). Plaintiff was also able to walk on his heels

and toes, could rise from a chair, and get on and off an examination table without any difficulty. *See* Tr. 362-63, 522, 523, 527, 530. And Ms. Combs, a nurse at Dr. Camillo's practice, assessed Plaintiff's GAF score at 55 in April 2009, indicating only moderate symptoms, or moderate difficulty in social, occupational, or school functioning (Tr. 511).[4] *See* DSM-IV. Finally, Plaintiff went deer hunting several times in the fall of 2008 (Tr. 510). These hunting trips lasted, according to Plaintiff's testimony, "maybe an hour to an hour and a half," Tr. 54,contradicting Dr. Camillo's opinion that Plaintiff would only be able to perform activities for a half an hour at a time, *see* Tr. 572.

Substantial evidence supported the ALJ's determination to assign little weight to Dr. Camillo's assessment and, therefore, the ALJ did not err by making this determination.

### B.   Plaintiff's Credibility

Next, Plaintiff argues that the ALJ erred in assessing little weight to Plaintiff's statements regarding his symptoms in relation to the RFC determination (*see* Tr. 18). *See* 20 C.F.R. §§ 404.1529, 404.1545(a)(3), 416.929, 416.945(a)(3). An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings regarding the

---

[4]Plaintiff argues that Dr. Shapiro's opinion should be rejected because he stated that Plaintiff reported that he "gets along well with friends and family." *See* Tr. 358-59

true extent of the claimant's symptoms. *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Caroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n. 6 (S.D.N.Y. 1995)(An ALJ's determination with respect to the credibility of witnesses is given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses.). Further, Plaintiff must produce appropriate, probative evidence in support of any subjective statements of symptoms, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous. *Centano v. Apfel*, 73 F. Supp.2d 333, 338 (S.D.N.Y.1999).

When an individual has a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, but the objective evidence does not substantiate the alleged intensity and persistence of the symptoms, the ALJ considers other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of his symptoms; (3) precipitating and aggravating factors; (4) the type of medication

and other treatment or measures which Plaintiff uses to relieve pain and other symptoms; (5) treatment other than medication Plaintiff has received for relief of pain and other symptoms; (6) any other measures used by Plaintiff to relieve pain and other symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff alleges that his anxiety was so severe that he often could barely get out of bed due to dizziness (Tr. 37), could not do any activities for more than 10 minutes at a time (Tr. 43-44), and that he avoided being around people to the extent that he went to stores early so he would not have to be around other shoppers (Tr. 50). Both the medical evidence and Plaintiff's description of his activities did not corroborate his complaints to the extent alleged, and, further, Plaintiff's statements regarding his symptoms were sometimes contradictory.[5] *See* 20 C.F.R.

_____

[5]Both the consultative examiners, Drs. Shapiro and Ganesh, as well as a treating physician, Dr. McElheran, noted that Plaintiff had no trouble with walking, walking on his heels and toes, rising from a chair, or getting on and off the examination table despite his alleged problems with balance and dizziness (Tr. 358, 362-63, 491, 494, 495, 523, 527, 530). Plaintiff's physical therapy  records show that by the spring of 2009 he "felt great" some days and only "a little dizzy" other days (Tr. 554-70). In her report, Dr. Shapiro noted that the results of Plaintiff's psychiatric examination were "inconsistent with [his] allegations" (Tr. 359). In April 2008 he reported no longer having panic attacks (Tr. 516). Plaintiff also contradicted himself, telling one doctor that his dizziness was caused by standing up from lying in bed (Tr. 516); to another doctor he said that his dizziness was caused by lying down (Tr. 494) or by leaning forward from a standing position (Tr. 494, 522). And despite Plaintiff's claim that he is unable to be around people, he told Dr. Shapiro that he "gets along well with friends and family" (Tr. 359), went deer hunting with his brothers (Tr. 54- 55), and by March 2008 he was able to go shopping without worrying about being around people (Tr. 457). Finally, as the ALJ noted, Plaintiff's subjective complaints were also belied by his ability to repeatedly

§§ 404.1529(c)(2), 416.929(c)(2). The ALJ therefore did not err in finding Plaintiff's subjective complaints not credible to the extent alleged.

### C. Evidentiary weight to the opinion of a non-physician, state-agency disability analyst ("single decision maker")

Next, Plaintiff argues that the ALJ improperly gave evidentiary weight to the opinion of J. Ayres, a non-physician, state-agency disability analyst (a "single decision maker") who prepared an RFC Assessment.  "Single decision makers" ("SDMs")are non-physician disability examiners who "may make the initial disability determination in most cases without requiring the signature of a medical consultant." 71 FR 45890-01, 2006 WL 2283653.  On May 19, 2010, the Chief Administrative Law Judge for the Social Security Administration issued a memorandum citing POMS[6] Instruction DI 24510.050C and instructing all ALJs that RFC determinations by SDMs should not be afforded any evidentiary weight at the administrative hearing level. Numerous courts have concluded, per this memorandum, that assigning any evidentiary weight to an SDM's opinion is an error. *See Yorkus v. Astrue*, No. 10-2197, 2011 WL 7400189, at *5 (E.D. Pa. Feb. 28, 2011) (collecting cases).

---

go deer hunting in the Fall of 2008. *See* Tr. 18, 510.

[6]The "POMS" is the Social Security Administration's "Program Operations Manual System," an internal manual used by Social Security employees to process disability claims.

In her decision,[7] the ALJ stated that Ayres's opinion "does not constitute a medical opinion" and therefore "is not entitled to much weight." Tr. 17. Plaintiff argues that, because the opinion is entitled to no weight, the ALJ's decision must be reversed. The Court disagrees.

The ALJ's decision does not indicate that Ayre's opinion was relied upon. The analyst stated that Plaintiff had an RFC for sedentary work — a more restrictive RFC than the ALJ ultimately found. *See* Tr. 15-17; Tr. 365-70. It would appear that the ALJ did not give much weight to the opinion and therefore does not constitute a basis for remand. *See Lawton v. Astrue*, No. 1:08-CV-0137, 2009 WL 2867905, at *16 n.28 (N.D.N.Y. Sept. 2, 2009)(no error in assigning "only slight weight" to the opinion of a disability analyst).

Moreover, Plaintiff has not demonstrated that he was prejudiced by the minimal weight afforded this opinion. *See Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (burden of showing harmful error "falls on the party attacking the agency's determination" )(citing *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997). The mere mention in the ALJ's decision that the analyst's report was "not entitled to much weight" is not a basis for remand, especially in light of the wealth of other information

---

[7]Administrative Law Judge Koennecke issued her decision on October 19, 2009.

that the ALJ considered. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (remand unnecessary where "application of the correct legal principles . . . could lead only to the same conclusion" (internal quotation marks and brackets omitted)); *Mitchell v. Astrue*, No. 09-CV-6301, 2010 WL3070094, at *4 (W.D.N.Y. Aug. 4, 2010) (remand inappropriate where Plaintiffs fails to show that any alleged error "was determinative of . . . the final RFC assessment"). Thus, the Court finds no reason for reversal on this ground.

### D.    Plaintiff's Capability to Perform Jobs Existing In Significant Numbers In The National Economy

Plaintiff argues that the ALJ erred in determining that Plaintiff was capable of performing jobs existing in significant numbers in the national economy. At step four of the sequential analysis, the ALJ found that Plaintiff was capable of performing his past relevant work as a maintenance worker "as it was actually performed." Tr. 18. That past work sometimes required frequently lifting up to 30 pounds and occasionally lifting much more. *See id.*; Tr. 135-36. As Plaintiff points out, this amount of lifting and carrying exceeds Plaintiff's RFC for light work. *See* Pl. Br. at 21; 20 C.F.R. §§ 404.1567(b), 416.967(b)(light work requires lifting no more than 20 pounds at a time).  The Commissioner concedes that the ALJ's step-four finding was erroneous but argues that the error was harmless because the ALJ made an alternative finding at step five of the sequential analysis that Plaintiff was

capable of performing other jobs existing in significant numbers in the national economy. *See* Tr. 18-19; *see Thompson v. Astrue*, No. 1:06-CV-1328, 2010 WL 502868, at *1 (N.D.N.Y. Feb. 9, 2010) ("[A] deficiency in an ALJ's step-four analysis does not require remand if the ALJ subsequently made a correct ruling at step five.").

At step 5 in the sequential evaluation, an ALJ is required to perform a two part process to first assess Plaintiff's job qualifications by considering his physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The second part of this process is generally satisfied by referring to the applicable rule of the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grid"). *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y.1996).[8]

---

[8]"The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of

"Generally the result listed in the Grid is dispositive on the issue of disability." *Id.* However, if the claimant has nonexertional impairments, the ALJ must determine whether those impairments "significantly" diminish the claimant's work capacity beyond that caused by his or her exertional limitations. *Id.* A claimant's work capacity is "'significantly diminished' if there is an 'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.*(quoting *Bapp*, 802 F.2d at 606). If a claimant's work capacity is significantly diminished by non-exertional impairments beyond that caused by his or her exertional impairment(s), then the use of the Grids may be an inappropriate method of determining a claimant's residual functional capacity and the ALJ may be required to consult a vocational expert. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *Bapp*, 802 F.2d at 604-605.

At step five, the ALJ found that, given Plaintiff's RFC, age at the time of the alleged onset date (39), high-school education, and ability to communicate in English, he was able to perform jobs that existed in substantial numbers in the national economy (Tr. 18-19). The ALJ relied on the Grid (Tr. 19). Plaintiff argues,

---

requirements in the primary strength activities of  sitting, standing, walking, lifting, carrying, pushing, and pulling." *Zorilla*, 915 F. Supp. at  667 n. 2; *see* 20 C.F.R. § 404.1567(a). Upon consideration of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

however, that because of evidence of his dizziness which was a manifestation of the anxiety disorder found to be a severe impairment, and because of his daily requirements to treat his pain, the ALJ erred by relying on the Grid rather than obtaining evidence from a vocational expert. *See* Pl. Br. at 21-22.

While the "mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]," *Bapp*, 802 F.2d at 603, here the ALJ failed to incorporate Plaintiff's symptoms of dizziness when considering Plaintiff's residual functional capacity even though she acknowledged that his dizziness was a manifestation of his severe impairment of anxiety. (Tr. 24).  While the ALJ took Plaintiff's anxiety into account when finding that Plaintiff had a moderate restriction in activities of daily living and a mild restriction in social functioning, *see* Tr. 15 ("This is so because of his dizziness . . . ."), and while the ALJ might have determined to discount Plaintiff's subjective complaints of dizziness for the reasons discussed above, that conclusion is not clear from the record.  It is not this Court's position to determine whether Plaintiff's complaints of dizziness should have been totally discounted, or whether the ALJ did so.

Further, Plaintiff argues that the ALJ failed to incorporate "the multiple actions Plaintiff takes daily to manage his neck pain and to follow his doctor's instructions." Pl. Br. at 19.

40

These consist of "home physical therapy, us[ing] a traction unit, and alternate[ly] applying ice packs and heat packs to his neck." *Id.*  Plaintiff contends that he would be unable to work "for significant portions of the work day when performing these activities to manage his pain." *Id.*  Defendant contends that, based on evidence that Plaintiff's physical therapy sessions (consisting of applying heat packs, traction, and stretching) lasted no more than 20 to 30 minutes, *see* Tr. 549-57, 563-66, 568-70, the ALJ could have concluded that Plaintiff would not need to perform "home physical therapy" exercises at work but instead could perform these activities before work, after work, or during work breaks.  Again, the record is not developed in this regard and this Court is not in the position to infer what the ALJ might have considered or concluded.

Although this Court must give deference to the Commissioner's decision, the present record leaves open the question of whether Plaintiff's work capacity is significantly diminished by the non-exertional impairments posed by his dizziness and daily treatment regime such to limit his ability to find meaningful employment opportunities in the national economy. Combined with the concession that the Commissioner erred at step four of the sequential analysis, the matter must be reversed and remanded for a hearing to resolve these issues.

## IV.   CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED,** and the case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405 (g) for further administrative proceedings consistent with this Decision and Order.

**IT IS SO ORDERED.**

**Dated:   September 18, 2012**

Thomas J. McAvoy
Senior, U.S. District Judge

42